# RHEAM v. MARTIN.

HUSBAND AND WIFE; PRINCIPAL AND AGENT; CONTRACTS; INDEPENDENT
CONTRACTOR; DIRECTING VERDICT.

1. That the husband is the agent of his wife is not to be implied from
   their marital relation, nor from the fact that the husband has entered
   into a contract with a view to her benefit, as well as his own. If not
   satisfied with the husband's responsibility, the other contracting party
   must secure that of the wife in some way recognized by law.
2. It is for the court to declare the meaning and legal effect of a written
   contract, and the determination of this question should not be left
   to the jury.
3. Where, in an action for work and materials furnished in the erection
   of the house of the defendants, husband and wife, it appears that the
   work was done under a written contract between the husband and
   one P., by which P. agreed to build the house for a certain sum, but
   the plaintiff claims that this contract was a pretense, and that P. was
   in reality a mere superintendent, and not an independent contractor,
   the court should direct a verdict for the defendants in the absence
   of testimony to show that such contract was a mere pretense.

No. 1566.  Submitted October 13, 1905.  Decided November 8, 1905.

HEARING on an appeal by the defendants from a judgment of
the Supreme Court of the District of Columbia upon the verdict
of a jury in an action against a husband and his wife.  *Reversed.*

The COURT in the opinion stated the case as follows:

This is an action of assumpsit begun by James W. Martin
against Henry U. Rheam and his wife, Julia A. Rheam, to re-
cover the sum of $355 for work done and materials furnished in
the erection of a house for the defendants.

It appears that the lot upon which the house had been erected

belonged to the two defendants.  Plaintiff testified substantial-
ly as follows: That Henry Rheam got an estimate from him
for the brickwork of the house, which amounted to $600, which
was afterwards reduced to $575.  That afterwards plaintiff
heard that W. S. Plager was going to build the house, and
Rheam told him to see Plager and give him an estimate.  That
he did so, adding $20 for an extra chimney wanted by Mrs.
Rheam.  That he finished the brickwork, for which he received
from Rheam $75 on July 3, and $150 on July 11, 1903.  That
he could not get the remainder of his money, and asked Rheam
for it.  That Rheam said, "I will stand good for it; you finish
your work and get an order, and I will pay you." (This was ob-
jected to by the defendants as irrelevant, that there was no
consideration for the promise, and that it was not in writing.)
Witness further said that Rheam was around half the time dur-
ing the progress of the work, and did nothing but give orders.
That Rheam gave him no orders directly, but complained to
him about not wetting the bricks properly.  That he knew
Rheam had given the job of building the house to Plager.  At
request of plaintiff, defendant produced the following writing,
addressed by Plager & Co. to H. U. Rheam, and read it in evi-
dence:

Washington, D. C., June 8, 1903.
Mr. H. U. Rheam to W. S. Plager, Architect and Builder
(Licensed), 708 F street, N. E.

Dear Sir:—

I agree to furnish all labor and material to erect and com-
plete one three-story brick dwelling at No. 644 C street, N. E.,
as per plans and specifications, using chestnut trimmings, doors,
etc., for the sum of two thousand three hundred and fifty dol-
lars ($2,350).  All work to be done in a first-class manner.

Yours truly,
Plager & Co.

Owner to furnish party walls.

On cross-examination plaintiff said that he knew Rheam had first obtained estimates from several material men, with a view to erecting the house himself. That afterwards he changed his mind and offered the plans and specifications to several contractors for bids. That he gave the contract for building the house to Plager. That he told plaintiff to see Plager and give him his estimate for the brickwork, and the job would be his. That he thereafter saw Plager and gave him the following written bid:

Washington, D. C., June 24, 1903.

Mr. Plager to J. W. Martin, Dr., Bricklayer and Contractor,
224 Seventh street, N. E.
Jobbing promptly attended to.

I propose to do brickwork on house between 6 and 7th, on C St., N. E., according to plans and specifications prepared by you, for the sum of $575, in addition to chimney in rear for the extra sum of $20—$595.                         James W. Martin.

I agree to pay the same.—W. S. Plager.

Plaintiff then further testified that the last line was written and signed by Plager after his work had been completed. That Rheam paid him the sums credited, and that the two receipts, of July 3 for $75 and of July 11 for $150, were for money paid by Rheam, though they read as though received from Plager. That he paid no attention to the name in the receipts. That, not being able to collect the balance due him, he authorized his attorney to write to Rheam on August 21, 1903. This letter notified Rheam that the work had been completed "according to his contract with Mr. Plager," and unless his claim be settled he would file suit to enforce a lien. It was admitted that plaintiff had filed a mechanic's lien on August 18, 1903. This notice recited the property and the balance due, and concluded in these words: "Being amount due to me for labor upon and materials furnished for the construction of said building under

and by virtue of a contract with William S. Plager, original contractor with owner."

W. S. Plager, called as a witness by the plaintiff, testified that he did business alone, under the name of W. S. Plager & Co., as an architect and builder, and had drawn the plans and specifications for the house of the defendants; that Rheam first intended to erect the house himself and get estimates; that afterwards witness made a bid for the entire construction, except party walls, which has been set out above; that other contractors made bids also; that Rheam accepted his bid; that witness was to furnish everything needed for the building, and began operations in June, 1903; that Rheam went for the excavator Perry, without consulting witness, and told him to go to work; that Rheam paid some money to the men, and some was paid to the plaintiff, but witness could not say who paid it; that there was an extra flue built by plaintiff which had been included in his estimate; that he supposed that there was some change in the stone, and guessed it was ordered by Rheam; he did not order it himself; that he thought Rheam paid some material men, and knew that he had paid some carpenters. Asked who superintended the work, the witness answered: "I tried to superintend it; I think Mr. Rheam ordered the bricklayers; that he stopped the first plumber working, who threw up the job;" that the plumber told him Rheam had stopped him, and witness took the second plumber to Rheam, who thereafter paid him for his work; that Rheam had told him he would like for plaintiff to do the brickwork; that Rheam paid Riley for tarring; that the plans and specifications provided that the contractor should pay for the building permit and make the deposit for permission to cross the sidewalk; that these were paid for, but not by witness. On cross-examination he said that he was the contractor for the job, and had received bids from several subcontractors, including plaintiff, to do parts of the work; that from time to time he gave orders to Rheam for the payment of money due material men and workmen, which he supposes were paid. Being shown the two receipts of the plaintiff, he said that they had been written by him, save the signature, which was plaintiff's;

that he supposed that he had paid plaintiff the money mentioned
in the receipt; "if he had not he would not have taken the re-
ceipts;" that the payments were made in Rheam's house, in
the presence of him and his wife. He also identified the fol-
lowing receipt as wholly written by him:

Washington, D. C., Aug. 8, 1903.
Received from Henry U. Rheam eleven hundred and thirty-
five dollars on house No. 644 C st. N. E., to date.

He further said that Rheam had paid for the work done and
material furnished to the amount of said receipt, else witness
would not have given it. He also identified an order given by
him to Rheam on August 14, 1903, to one Riley, for $9.50, for
tarring done on the house. He said, also, that he threw up the
job some time in August, and that plaintiff had then finished
all the brickwork contracted for except the pillars for the porch.

John W. Scott, a witness for plaintiff, testified that Rheam
and plaintiff met in his presence in the fall of 1903; that plain-
tiff asked him for his money, and Rheam asked him why he
did not finish the work, saying: "You go ahead and finish your
work, and get an order from Plager, and I will pay you."

L. W. Riley testified, for the plaintiff, that Plager employed
him to tar the building, and did not see Rheam about it; that
Rheam directed work to be done, and paid him on the order
from Plager; "that he did not go after the money, but Rheam
came to his house and paid him after he had made a 'draw' from
the building association."

William H. Chappell, for plaintiff, testified that he was a
stone cutter, and had done work for defendants; that he esti-
mated to furnish Indiana limestone, which he delivered; but it
was returned and he then furnished a brownstone; that this
stone was more expensive than that he had agreed to furnish;
that no directions were personally given by Rheam; that about
two weeks before Plager quit the job he referred witness to
Rheam for money, and Rheam said that when he had finished
he would pay him; that Rheam told him to get an order from

Plager, which he did, and Rheam refused to honor it; but he took it to the building association, and was paid in the "wind up;" that in the "wind up," after Plager quit, Rheam was finishing the house himself.

E. T. Kauffman, for the plaintiff, testified that he had been employed by Plager to do the plumbing, having given the latter a bid, which he accepted; that, before starting, Plager took him to Rheam, who told witness that he would be responsible for his money; that Rheam went to a plumbing house and secured the material; that he received instructions for the work from Mr. and Mrs. Rheam; that he was paid in part by Rheam, and a balance was still due. On cross-examination he said that he did not know who paid the money for his work, as his son had received it for him.

John F. Callan, for plaintiff, testified that he first gave an estimate for the tinning and heating to Rheam, and afterwards to Plager, as he understood that the latter had undertaken the job; that Plager did not finish the house; that he overheard Rheam tell another man that "there was dollar for dollar for every man who did work on the building, and that he would see that it was paid; that no man who did work on his building would lose a cent;" that he received money from Rheam on Plager's order, and that he did not finish his work.

Plaintiff having closed, the defendant Julia Rheam moved for an instruction to the jury to return a verdict in her favor, because she had not been shown liable for plaintiff's claim. This motion was denied and exception was taken.

On behalf of defendants, Henry U. Rheam testified, substantially, that Plager drew the plans and specifications for his house, and that he first intended to build it himself; that he changed his mind and submitted the same to Plager and two other independent contractors, I. W. Downing and Mr. Moxley; that he accepted Plager's bid of $2,300, and that the latter began work in June and continued until August 8, at which time the house was under roof and the brickwork completed, except that required for the front porch; that witness retained no control of the work, and looked to Plager for everything; that

Martin contracted with Plager, and witness gave him no orders; that when he could not get Plager to attend to wetting the bricks he sent the building inspector to look after it; that he saw plaintiff before Plager quit the job, who complained that he could not get his money from Plager, and witness told him he had better finish his work before talking about money; that Plager had given him two receipts signed by plaintiff; that he had paid no workmen or material men except upon written orders from Plager; that he never promised to pay plaintiff anything; that the first plumber threw up the job because he could not get material on credit and witness refused to stand for it; that Plager brought the second plumber, and, at Plager's request, witness agreed to stand good for the material needed; that the price came out of the money he was to pay Plager, and that the tarring was paid for on a written order from Plager, because Riley had refused to do it unless witness promised to pay him; that he did not change the stone; that Plager threw up the job about August 8, and witness notified him he would finish it at his expense; that he had then paid Plager $1,135, which included all money that he had paid on Plager's orders; that after August 8 neither plaintiff nor Plager did any work on the house; that witness was compelled to finish the house on Plager's failure, and paid out altogether $2,559.38, including the $1,135 paid to Plager; that he had lost $209.38 through Plager's failure and had to give his own services in addition, which were worth about $100; that witness had some money when the contract was made, and had arranged with the Perpetual Building Association for the loan of the remainder. On cross-examination he said that he had known Plager for twenty-five years, and had required no bond from him for the performance of his contract; that he did not disburse the money for work on the house; that the $1,135 receipt of Plager included money paid for plumbing material which he had stood for to the dealers; that he did not take any of the bricks that plaintiff bought, to see if they were all right; that he did get some from the brickyard, and called Plager's attention to the fact that they were of

an inferior quality; that he was around the building "pretty much all the time."

Julia A. Rheam testified, substantially, that she had given no orders to plaintiff or anyone else; that she was present in her house when plaintiff received the money mentioned in his receipts to Plager, who had paid him the money and gave the receipts to her.

J. W. Downing, for the defendants, testified that he was a carpenter and contractor, and had bid on the plans for the house; that he knew that Moxley and Plager also made bids; that he did some carpenter's work on the house afterwards, for which he was paid by Plager's foreman; that Martin made him an estimate for the brickwork in writing, which had been lost. Defendants then offered to show by the witness that plaintiff had made an estimate for the same brickwork, but at a less figure than that made to Plager. The court sustained plaintiff's objection to this evidence, and defendants excepted.

Upon the close of the evidence, the defendants prayed the court to instruct the jury (1) to return a verdict for Julia A. Rheam; (2) to return a verdict for Henry U. Rheam; (3) that under the evidence Plager was an independent contractor; (4) that if Plager contracted to erect the house and furnish the labor and material therefor, for a certain sum, free from the control and direction of the defendants, he was an independent contractor, and their verdict should be for defendants, unless they found from the evidence that the defendants legally bound themselves to pay the plaintiff for his work; (5) that even if they believed from the evidence that defendant Rheam told plaintiff he would stand good for the money due him from Plager, or that he would pay him, or see him paid therefor, that such promise was not enforceable unless they found there was a consideration therefor, and that such promise, if made, was one to pay the debt of another, and, if not in writing, could not be enforced. These prayers were in turn refused and exception noted.

The court then, over the objection of the defendants, charged the jury, among other things, as follows:

"That the contract of building in this case differed from most contracts of that sort, with which the jury was doubtless familiar, especially with the provisions for a bond and payments to the contractor at stated times as the work progressed; that it was a question for the jury to decide whether or not, under the arrangement between the defendants and Mr. Plager, as it appeared from all the evidence in the case, Plager was an independent contractor, and the contract between the defendants and Plager was a bona fide contract to erect the house, or was a mere form under which some other matters or things were to be done,"—and said in the course of his charge to the jury, in reference to the receipt of $1,135 given by Plager to Rheam: "I would take it that the receipt is in full payment of money due to date, not that it included all the work done, or that it paid for all the work done;" also, "I suppose it meant cash payment to date, not for all the work done;" but I leave all this for the jury to decide, and that "they were to decide whether the contract between Plager and Rheam was made in good faith, or whether from all the evidence Plager was merely a superintendent."

Under these instructions the jury returned a verdict for the plaintiff for the amount claimed to be due; and from the judgment entered thereon the defendants have prosecuted this appeal.

Mr. *Wharton E. Lester* for the appellants.

Mr. *Joseph A. Burkhart* and Mr. *J. Athens Johnson* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

We are of the opinion that this judgment must be reversed upon the grounds that will be stated briefly as the conditions per-

mit, without undertaking a separate discussion of the errors that have been assigned upon the numerous exceptions taken on the trial.

The motion on behalf of the wife, Julia A. Rheam, for an instruction to the jury to return a verdict in her favor, should have been granted. Aside from the fact that she had an interest in the lot, it does not appear that she had any connection with the subject-matter of the action. It is not pretended that she undertook to have the house erected, or invited any bid therefor. Nor is there any evidence tending to show that she entered into any contract with plaintiff, that she undertook to pay him anything, or that she assumed any liability for contracts or promises that her husband may have made. Assuming that a married woman may be separately bound by a contract made on her behalf by an authorized agent, such agency is not implied from her relation to her husband, or from the further fact that he may have undertaken an enterprise with a view to her benefit also. Surely, the husband may enter into a contract, having in view the ultimate benefit of his wife as well as himself, without thereby bringing her under a legal obligation. It is incumbent upon the other contracting party, if not satisfied with the husband's responsibility, to secure that of the wife in some way recognized by the law.

After refusing the instruction to return a verdict for each defendant, the case was submitted to the jury upon the theory that there was sufficient evidence from which they might deduce the inference that the contract with Plager, which the plaintiff called for and read, was a mere form or pretense, not intended in good faith to operate as an independent contract for the complete erection of the house, and that Plager was, therefore, nothing more, in fact, than a mere superintendent for the owners and real builders. In this view of the tendency of the evidence, the court should, at least, have charged the jury that the legal effect of the accepted bid was to make Plager an independent contractor for the erection of the house, according to the plans and specifications, at the price stipulated. The contract was in writing, and it was for the court to declare its meaning and legal

effect, when requested so to do, and not leave it to the determination of the jury. And then the jury should have been charged that this contract relation so created made a prima facie case entitling the defendants to a verdict, unless they should believe from the evidence that it was not a bona fide contract, but a mere form intended to conceal the real relations of the parties.

In our opinion, however, the evidence on behalf of the plaintiff, assuming its truth and giving him the benefit of every inference fairly deducible therefrom, was not legally sufficient to warrant the submission of the issue to the jury at all.

It is evident from the testimony of Plager, who was called by the plaintiff, that his bid was made and accepted in good faith; that he invited bids from subcontractors for parts of the work, and went about the performance of his contract until his failure in August, 1903. It is also evident that the plaintiff regarded him as the contractor. He submitted his bid to Plager, received his acceptance, and required no acceptance or guaranty from the defendants. His receipts for money were given to Plager. As late as August 21, 1903, some time after his work had been done and Plager had failed, his attorney wrote to Rheam, saying that unless his debt should be promptly paid he would proceed to enforce a mechanic's lien for the value of his labor and materials furnished "under and by virtue of a contract with William S. Plager, original contractor with owner." He had then exhausted all ordinary means to secure payment from Rheam, and knew as much at the time as he did when he testified of the actual relations of Plager and Rheam. Other subcontractors who testified for the plaintiff understood that Plager was an independent contractor, and made their bids to him. The circumstances that Rheam was a constant visitor, watching the progress of the work and raising frequent objections to the character of the materials, do not of themselves, or in combination with others, warrant the inference of a fact in opposition to or inconsistent with the facts before mentioned. It was clearly within the right of the owner to ascertain if the work of contractor and subcontractors was being done in accordance with the plans and specifications, and it was reasonable

to exercise that right. Regarding his objection to the Indiana limestone and its substitution by brownstone, the inference is that the latter, and not the former, was required by the specifications, in the absence of proof to the contrary. Again, it does not appear that the first plumber engaged by Plager was not objected to on the ground of incompetency or inability to furnish the necessary materials. The circumstance that Rheam guaranteed the payment for the materials furnished by the dealer to the second plumber bears, if anything, in favor of the defendant, rather than the plaintiff. The dealer, acting upon the assumption that Plager was an independent contractor, and not the superintendent and agent of the owner, was not satisfied to credit Plager, and therefore required the owner "to stand for it." The same course was open to the plaintiff. There was nothing unreasonable or so unusual in the owner's conduct as to warrant an inference that he was concealing his true relations with Plager from the public. Strong reliance is placed upon the following circumstance: Plaintiff testified that some time after the 11th of July he asked Rheam for payment, and Rheam said, "I will stand responsible for it; you finish your work, and get an order, and I will pay you." Another witness gives the date of this statement as in the fall of 1903. If the first is correct, Plager had not then abandoned the contract; if the latter, then he had abandoned it some time before. An any rate, the work for which plaintiff has sued had then been done.

It is more reasonable to suppose, from the reference to Plager and the order from him, that the date given by plaintiff himself is the correct one. As this was not introduced as evidence of a special promise to pay, on which the action was based, but as a circumstance bearing on the true relation of defendant and Plager, it is unnecessary to consider the objections of the defendant that it was a verbal promise to pay the debt of another, as well as without valuable consideration to support it. Considered as such a circumstance, it is entitled to no weight. It simply shows, on the one hand, that plaintiff was trying to get his money, and, on the other, that the defendant, his relations with Plager not being then severed, was willing to pay him, as

he had done others, on the strength of his obligation to Plager. Plaintiff had not then completed his contract by building the pillars of the porch, nor has he ever done so. Subsequently, and without this completion, he obtained an order from Plager, which the defendant refused to honor. In this connection it is to be remembered that defendant's testimony to the effect that he owed Plager nothing, and that he was compelled to pay out more money to complete the house than Plager's contract called for, was not denied by Plager, who had the opportunity to do so, if untrue. Contracts for the erection of houses would be of little or no protection to the owners of property if they could be overturned by evidence of the character relied on by the plaintiff.

For error in not instructing the jury to return a verdict for both defendants, the judgment will be reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion. It is so ordered.                    *Reversed.*